**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| FEDERAL TRADE COMMISSION, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 09 C 2927 |
| | ) | |
| TRANSCONTINENTAL WARRANTY, INC., | ) | |
| et al., | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION**

Before the court is the federal equity receiver's motion to require Mepco Finance Corporation ("Mepco") to turn over funds allegedly belonging to the receivership estate. We deny the receiver's motion for the reasons explained below.

**BACKGROUND**

On May 14, 2009 we entered a temporary restraining order enjoining defendant Transcontinental Warranty, Inc.'s alleged telemarketing scheme and freezing its assets. (See Temporary Restraining Order with Asset Freeze and Other Equitable Relief ("TRO") at 4-8.) In the same order we appointed a receiver to assume control of Transcontinental's business and ordered any person or entity holding Transcontinental's assets to deliver them to the receiver. (Id. at 13, 19.) Our order defines "assets" broadly to include "any legal or equitable interest in, right to,

or claim to, any real or personal property." (<u>Id.</u> at 3.) Pursuant to our order the receiver demanded that Mepco turn over funds that the receiver alleges are due under Mepco's contract with Transcontinental (the "Dealer Agreement"). Pursuant to that agreement Transcontinental contracted to sell "vehicle service contracts" ("VSC's") to purchasers payable by the purchaser in installments. (<u>See</u> Dealer Agmt., attached as Tab 1 to Decl. of Scott McMillan (hereinafter "McMillan Decl."), ¶ 1.)[1] Mepco, in turn, "servic[ed]" the payment plans: it supplied the payment-plan agreement forms, collected the payments from the purchasers, and distributed the funds to Transcontinental (which received a fee for each contract sold) and the "administrator" (which acts as a claims adjuster, authorizing payments under the VSC's), while retaining a fee for itself. (Dealer Agmt. ¶¶ 1-3.) Transcontinental's fee was payable "[o]n or about the 10th day of the month following the month in which a Purchaser has made the second installment due under such Purchaser's Payment Plan Agreement." (<u>Id.</u> at ¶ 3.) That payment consisted of the "remaining funds due [Transcontinental] after adjustments for the Discount Amount [i.e., Mepco's fee], any amounts due Mepco by Dealer and other amounts retained by Mepco." (<u>Id.</u>) The "amounts due Mepco by Dealer"

---

[1] According to the FTC's complaint, Transcontinental misled consumers to believe that the VSC's were "extended warranties" and that Transcontinental was affiliated with the consumer's automobile dealership or with the vehicle's manufacturer. (Compl. ¶¶ 10-17.) The FTC has not named Mepco as a defendant in this lawsuit.

include "refunds" that Transcontinental owes Mepco in the event that a purchaser cancels the VSC, which a purchaser may do at any time. (Id. at ¶ 4.) Transcontinental anticipated receiving a wire transfer of between $125,000 and $150,000 on May 15, 2009, representing its fee net of refunds, and similar payments over the following weeks based on VSC sales through May 14, 2009 — the date that our order effectively terminated Transcontinental's business. (Mot. of Fed. Equity Receiver Lepetomane, XXVI, Inc. to Require Turnover of Funds from Mepco (hereinafter, "Turnover Motion") ¶¶ 4-5.)

Mepco, apparently informed of this lawsuit, cancelled the May 15 payment. In a letter dated May 14, 2009 Mepco stated that it would "no longer accept any payment plans from you for servicing pursuant to your dealer agreement with Mepco." (Letter of May 14, 2009, attached as Ex. A to Turnover Mot.) It also "suspend[ed] all funding in accordance with the dealer agreement." (Id.; see also Dealer Agmt. ¶ 4 ("In the event Mepco deems itself insecure, Mepco shall have the right to retain any funds due Dealer until such time as Mepco deems itself secure.").) The receiver subsequently served Mepco with a copy of the TRO and demanded that Mepco transfer to the receiver "all funds in which Transcontinental has an interest." (Turnover Mot. ¶ 8.) Mepco refused, and objects to the receiver's turnover motion.

**A.    WHETHER THE PARTIES' COMPETING CLAIMS MAY BE ADJUDICATED IN A SUMMARY PROCEEDING**

We agree with the receiver and the FTC that we may compel Mepco, a non-party, to turn over receivership property in its possession.  See, e.g., United States v. Arizona Fuels Corp., 739 F.2d 455, 458 (9th Cir. 1984) ("A receiver may proceed summarily to recover money belonging to the receivership by petition to the appointing court for an order to show cause against a possessor not a party to the original action."); see also 2 Clark on Receivers § 333 (3d ed. 1959)("One having property belonging to a receiver must deliver it up.").  District courts routinely enforce such orders in conjunction with lawsuits filed by government agencies on behalf of injured consumers.[2]  But as Mepco points out the receiver is not claiming property held by Mepco in Transcontinental's name.  Cf. Federal Trade Commission v. NHS Systems, Inc., No. 08-2215, 2009 WL 3072475, *6 (E.D. Pa. Sept. 24, 2009) (concluding that "settled" funds held by a third-party payment processor were receivership property).  Instead, it is asserting a disputed right to payment under the Dealer Agreement.  Cf. id. ("[T]he claims of the non-party Teledraft — not the claims of the Receivership — are contractual.").  In that sense, we agree with Mepco that the receiver and the FTC are overreaching.  (See Mepco's Obj. ¶ 36 (likening the receiver's motion to a prejudgment attachment).)  But

_____

[2]  See Federal Trade Commission v. Neiswonger, No. 4:96CV2225SNLJ, 2009 WL 2998356, *3 (E.D. Mo. Sept. 15, 2009)("[P]ursuant to the exercise of its broad equitable powers to protect the assets of the receivership estate, this Court may order non-parties to turn over receivership assets to the Receiver.") (citing cases).

the question remains whether the receiver must reduce its claim to a judgment in a separate lawsuit, with the cost and delay that that entails, or whether we may adjudicate the parties' claims in this lawsuit. Cf. SEC v. Elliot, 953 F.2d 1560, 1566 (11th Cir. 1992) ("A summary proceeding reduces the time necessary to settle disputes, decreases litigation costs, and prevents further dissipation of receivership assets.").

"[S]ummary proceedings satisfy due process so long as there is adequate notice and an opportunity to be heard." See SEC v. American Capital Investments, Inc., 98 F.3d 1133, 1146 (9th Cir. 1996), abrogated on other grounds by Steel v. Citizens for a Better Environment, 523 U.S. 83 (1998).[3] Mepco received notice of our order and has had ample opportunity to develop its defenses to the receiver's motion in this court. It argues, or at least implies, that it is entitled to a jury trial on the premise that the receiver's turnover motion is really a claim for breach of contract. (Mepco Reply at 20 ("Outside of this receivership context, if Transcontinental believed that Mepco improperly

---

[3] See also SEC v. Universal Financial, 760 F.2d 1034, 1037 (9th Cir. 1985) (No due process violation where the "district court afforded [non-party investors] virtually all of the procedural protections which would have been available in plenary proceedings."); Elliot, 953 F.2d at 1567-71 ("[A] district court does not generally abuse its discretion if its summary procedures permit parties to present evidence when the facts are in dispute and to make arguments regarding those facts."); NHS Systems, 2009 WL 3072475, *8-9 (utilizing summary proceedings); Neiswonger, 2009 WL 2998356, *3 (same); F.T.C. v. J.K. Publications, Inc., No. CV 99-00044 ABC, 2009 WL 997421, *4 (C.D. Cal. Apr. 13, 2009) ("[D]istrict courts are not prohibited from using summary post-judgment proceedings to adjudicate the claims of non-parties as to property claimed by receivers."); but see SEC v. Ross, 504 F.3d 1130, 1144-45 (9th Cir. 2007) (summary proceedings inadequate to resolve allegation that third-party itself violated securities laws).

exercised its contractual right to deem itself insecure, Transcontinental's recourse would be to file suit against Mepco on a breach of contract claim.")); see also Eberhard v. Marcu, 530 F.3d 122, 136 n.15 (2d Cir. 2008) (concluding that an intervening party was entitled to a jury trial on her claim to assets held by receiver). Common sense indicates that Mepco was right to deem itself "insecure" after the FTC filed this lawsuit, and we agree with Mepco that our order appointing the receiver did not eviscerate that provision of the parties' contract. But that provision is only a stop-gap, permitting Mepco to withhold money "until such time as Mepco deems itself secure." (Dealer Agmt. ¶ 4.) There is no prospect of future "security." All that is left is to determine the parties' remaining obligations with respect to payment-plan agreements that Transcontinental sold prior to November 14, 2009. With respect to that issue Mepco raises the equitable defense of setoff, and it does not cite any authority for the proposition that we cannot adjudicate an equitable defense in a summary proceeding. Cf. Eberhard v. Marcu, 530 F.3d at 136 n.15 (observing that summary proceedings may be appropriate where the third-party's claim to receivership property is premised on equitable rights like setoff) (citing Arizona Fuels, 739 F.2d at 456, 459). On the contrary, Mepco invites us to decide that question and claims an interest (as a creditor) in the receivership's assets. (See Mepco's Supp. Brief at 4); see also

<u>Arizona Fuels</u>, 739 F.2d at 459 (summary proceedings are proper "where the third person becomes sufficiently involved in the receivership action, for example by intervening").  We conclude that we may adjudicate the parties' competing claims in a summary proceeding.

**B.   WHETHER THE CLAIMED FUNDS ARE RECEIVERSHIP ASSETS**

Mepco argues that the payments the receiver demands are "loans" or "advances."  (McMillan Decl. at ¶¶ 11-13.)   This characterization is relevant, Mepco contends, because a contract to make "financial accommodations" cannot be assumed by the trustee in bankruptcy.  <u>See</u> 11 U.S.C. § 365(c)(2) (The trustee may not assume a "contract to make a loan, or extend other debt financing or financial accommodations, to or for the benefit of the debtor."); <u>see also</u> <u>In re Thomas B. Hamilton Co., Inc.</u>, 969 F.2d 1013, 1018-19 (11th Cir. 1992) ("[C]ourts define the term 'financial accommodations' narrowly, as the extension of money or credit to accommodate another.") (citation and internal quotation marks omitted).  Mepco argues that § 365(c)(2) should guide us, taking its cue from the receiver's turnover motion, which also relied on the Bankruptcy Code.  (<u>See</u> Turnover Mot. ¶¶ 10-11); <u>see also</u> L.R. 66.1 ("[A]dministration of estates by receivers or other officers shall be similar to that in bankruptcy cases.").  In the bankruptcy cases Mepco relies on the financing component of the parties' transaction was clear; it was only a question of whether financing

was integral (rather than incidental) to the transaction as a whole for § 365(c)(2)'s purposes.  See In re Twin City Power Equipment, Inc., 308 B.R. 898, 902 (C.D. Ill. 2004) (agreement to finance retailer's floor inventory); In re Cole Bros., Inc., 154 B.R. 689, 692-93 (W.D. Mich. 1992) (similar).  Here, the "financial accommodation" is elusive.  Transcontinental did not "resell" vehicle service contracts purchased from administrators with credit supplied by Mepco.  There are no references in the Dealer Agreement to loans, advances, collateral, financing statements, credit, or debt.  The agreement refers to the money that is "due" to Transcontinental, payable out of funds collected by Mepco from VSC purchasers.  The fact that Transcontinental owes Mepco a "refund" for cancelled contracts does not make the Dealer Agreement a contract to make a financial accommodation.  See In re Thomas B. Hamilton Co., Inc., 969 F.2d at 1020 (credit-card processing agreement assumable despite merchant's obligation to repay bank for chargebacks).

We think that Mepco's "financial accommodation" argument obscures a more basic question: whether in fact any money is "due" to the receiver under the Dealer Agreement. (See Mepco Supp. at 2,4.)  In the wake of this lawsuit the FTC instituted an "opt-in" program allowing consumers who purchased VSC's from Transcontinental to continue their contracts.  Failure to "opt-in" resulted in the VSC's termination.  It appears that relatively few purchasers took the FTC up on its offer.  (McMillan Supp. Decl. ¶

4.) Our order appointing the receiver did not terminate the Dealer Agreement, pursuant to which Transcontinental agreed to provide a "refund" for each cancelled contract. (Dealer Agmt. ¶ 4; see also Turnover Mot. ¶ 4.) The wave of cancellations increased Transcontinental's refund obligation (which currently stands at $1,264,338.39, according to Mepco). The receiver insists that these post-receivership developments are irrelevant — whatever commissions were due as of the date of the receivership are receivership property and any post-receivership cancellations give rise to, at most, an unsecured claim.[4] (Receiver's Resp. in Opp'n to Mepco's Supp. Brief at 3.) But it does not cite any authority for this proposition, which has the effect of giving the receiver the Dealer Agreement's benefits without its burdens. Mepco claims a right of setoff, but we think the equitable doctrine of recoupment is a better fit:

> In any action between the estate and another, the defendant is entitled to show through recoupment that he or she is not liable in part or in full for the plaintiff's claim due to matters or events arising out of the same transaction. . . . Unlike setoff, there is no requirement under the doctrine of recoupment that the relevant obligation and the corresponding right of reduction must have arisen before the commencement of the debtor's bankruptcy case.

5 Collier on Bankruptcy ¶¶ 553.10 (Alan N. Resnick & Henry J Sommer eds., 15th ed. rev.); see also Reiter v. Cooper, 507 U.S. 258, 265

---

[4] The receiver does not appear to dispute that *pre*-receivership cancellations may be applied to the commission payments in the manner specified in the Dealer Agreement. (Turnover Mot. ¶¶ 4-5 (seeking commission payments net of cancellations as of May 14, 2009).)

n.2 (1993) ("Recoupment permits a determination of the just and
proper liability on the main issue, and involves no element of
preference.") (internal citations omitted).   Transcontinental's
"refund" obligation arises from the cancellation of contracts for
which the receiver is demanding commission payments.   The two
obligations arise from the same contract and from the same
transaction.   The fact that the bulk of Transcontinental's
cancellation obligations arose post-receivership is irrelevant.
See 5 Collier on Bankruptcy ¶¶ 553.10; see also In re TLC
Hospitals, Inc., 224 F.3d 1008, 1011 (9th Cir. 2000)("Unlike
setoff, recoupment is not limited to pre-petition claims and thus
may be employed to recover across the petition date."); In re
Harmon, 188 B.R. 421, 425 (9th Cir. 1995) ("In recoupment, the
elements of the debt may arise either before or after the
commencement of the case.").  We conclude that Mepco is entitled to
recoup cancellation payments from the amounts that would otherwise
be due to Transcontinental for payment-plan sales.  Leaving aside
any other contract defense Mepco might have, its right of
recoupment raises substantial doubt as to whether it owes any
obligation to pay commissions to the receiver.  For that reason we
deny the receiver's turnover motion.  However, we agree with the
receiver that Mepco must demonstrate how it arrived at the
cancellation fee stated in Mr. McMillan's declaration.  It is also
directed to provide information concerning the "hold back

amount[s]" referenced in its objections.  (See Mepco Obj. at 5 n.1.)

## CONCLUSION

The receiver's turnover motion (29) is denied.  Mepco is directed to provide the FTC and the receiver with information (1) necessary to verify the claimed amount of Transcontinental's refund obligation under the Dealer Agreement, and (2) relevant to the "hold back amount[s]" referenced in its objections.  Mepco shall provide that information on or before January 6, 2010.  A status hearing is set for January 13, 2010.


DATE:     December 22, 2009

ENTER:    _____
          John F. Grady, United States District Judge